UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERITHA SMITH, KENDRA GARCIA, LASHONDA DANDRIDGE, and ASHLEY COLLIER, | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | ) No. 3:10-00873<br>) Judge Sharp |
| DRAUGHONS JUNIOR COLLEGE, INC. d/b/a DAYMAR INSTITUTE, | )<br>) |
| Defendant. | ) |

## MEMORANDUM

This is a racial discrimination, hostile work environment, and retaliation case[1] against Defendant Draughons Junior College Inc. d/b/a Daymar Institute ("Daymar") brought by four African American females. Defendant has filed separate Motions for Summary Judgment as to each Plaintiff (Docket Nos. 23, 28, 33 & 39) and those Motions have been fully briefed by the parties. (Docket Nos. 20, 24, 37, 38, 49, & 59).

In order to give due consideration to the separate motions, while at the same time avoiding repetition, the Court will issue two separate Orders and Memoranda. An opinion to be issued shortly hereafter considers the claims of Plaintiffs, Sheritha Smith, Kendra Garcia and Lashonda Dandridge, all of whom were terminated from their positions in the Admissions Department at Daymar. This opinion addresses the Motion for Summary Judgment with respect to the claims brought by Plaintiff

---

[1] In their Complaint, Plaintiffs also alleged that they were subjected to the tort of outrageous conduct. However, in their response brief, Plaintiffs indicate that they "voluntarily dismiss or abandon their claims for outrage under Tennessee common law." (Docket No. 59-1, n. 1). Accordingly, the Court does not consider that claim.

1

Ashley Collier ("Plaintiff") who, unlike the other Plaintiffs, was not a full-time employee in the Admissions Department at Daymar.

## I. FACTUAL BACKGROUND

Construed in Plaintiff's favor, the relevant, supported, facts are as follows:

Daymar is a private, post-secondary institution, with six campuses in Tennessee and Kentucky. Sometimes described as a "career college," Daymar offers associates and bachelors degrees in a variety of different programs.

Plaintiff was a student at Daymar's Nashville campus from September 24, 2007 through March 29, 2010, when she obtained her Associates Degree. From April 2009 until her graduation, she worked a federal work-study position in the Financial Services Department at Daymar. In that position, Plaintiff was supervised by Department Head Janie Rager ("Rager").

Plaintiff's complaints stem from the alleged conduct of Elizabeth Collier ("Collier"),[2] a Caucasian female, who served as the Director of Admissions at Daymar, and who had no supervisory authority over Plaintiff. Specifically, Plaintiff claims that she was subjected to racial harassment by Collier and to racial discrimination when she was not hired for positions in the Admissions Department and Student Services Department.

With regard to the alleged racial harassment, the undisputed evidence is that Plaintiff's contact with Collier was extremely limited. In fact, aside from casual greetings in the hallway, the two had substantive contact on only four occasions, and those contacts took place during the period of January to March 2010.

---

[2] So as to differentiate between the two Colliers, the Court refers to Elizabeth Collier simply as "Collier," and Ashley Collier as "Plaintiff."

The first contact occurred when the two ran into each other at the doorway to a women's restroom on campus. During that encounter, Collier commented on Plaintiff's new wig by allegedly saying, "You people are always changing your hair." Plaintiff "kind of laughed it off and went in the restroom." (Docket No. 65-5, Pf. Depo. at 20).

The second contact occurred after Plaintiff participated in a group interview for an Admissions Representative position on January 27, 2010.[3] Sometime during the following week, Plaintiff met with Collier to discuss Plaintiff's performance. Plaintiff claims Collier told her that she had done really well in the interview. When Plaintiff asked whether the position had been filled, Collier allegedly stated that it had not, but also that Plaintiff would not be getting the job because she did not yet have her Associate's Degree. Plaintiff does not claim that Collier said anything offensive during this meeting, and, in fact, admits that Collier complimented her.

Sometime after the meeting regarding Plaintiff's performance during the interview, Plaintiff had her third encounter with Collier. On that occasion, Collier went to Plaintiff's office to talk to her about having missed a financial aid appointment. When Plaintiff apologized for missing the appointment, Collier allegedly stated, "You better be glad I like you or else I'd give you 30 lashes across the back with a limp noodle." (Id., Pf. Depo. at 9 & 23).[4] Plaintiff claims that, while making the statement, Collier was in her "face" and that Plaintiff was intimidated by the tone of Collier's voice and the closeness of her body.

---

[3] As will be discussed below, Plaintiff did not get that job and that serves as the basis for her claim that she was discriminated against in hiring.

[4] At some points in her deposition, Plaintiff refers to lashes across the back, while at another point she refers to lashes across the face. (Id., Pf. Depo. at 9, 23 & 25). Collier denies saying "lashes across the back" or "limp noodle," but admits that she might have said "thirty lashes with a wet noodle" since that was a phrase that her mother frequently used. (Docket No. 25, Collier Decl. ¶¶ 33-34). In the final analysis, these discrepancies are of no significance.

The fourth and last encounter occurred at some point after Plaintiff missed her financial aid appointment, and after she decided not to pursue a Bachelor's Degree at Daymar. Plaintiff claims Collier came to her office while Plaintiff was eating lunch, threw a sticky note pad into her lunch, and stated, "You are at the wrong school. We are not going to be able to accommodate you. You are going to need to find another school." (Id., Pf. Depo. at 60-64). Collier then stormed off.

At the beginning of her employment, Plaintiff received Daymar's employee handbook. The handbook explains that Daymar is an equal opportunity employer and employees are encouraged to bring discrimination claims to their immediate supervisor or Human Resources. In addition, the handbook contains a sexual harassment policy, which also encourages complaints to supervisors or Human Resources.

Plaintiff never complained to anyone in authority or to Human Resources about Collier, but she did tell a couple of co-workers about the "limp noodle" comment. Collier was unaware that Plaintiff complained to her co-workers, although Plaintiff claims that after the "limp noodle" comment was made, Rager came into the room and walked Collier down the hallway.

Apart from the alleged harassment, Plaintiff claims she was discriminated against when Daymar failed to hire her as an Admissions Representative, or for two Student Services positions.

With regard to the Admissions Department position, Collier claims she does not hire students into such positions because they often have conflicting schedules and the Admissions Representative must work forty hour weeks, including two evenings per week. Collier's personal position aside, LeaAnn Newman ("Newman"), the Vice President of Human Resources at Daymar, has submitted a declaration in which she indicates that, as a part of the Federal Work Study Program authorized by the United States Department of Education, Daymar makes available certain part-time positions

4

at its campuses to students receiving financial aid, but none of those positions are in the Admissions Department. It is Newman's understanding that the governing regulations do not allow federal work study employees to be allowed to work in Admissions. (Docket No. 26, Newman Decl. ¶¶ 21-24).

Regardless of policy, Plaintiff claims that Collier told her she would not receive the Admissions Representative position because Plaintiff had yet to complete her Associate's Degree. Nevertheless, Sherry Corsi ("Corsi") and Crystal Truesdale ("Truesdale"), both of whom are Caucasians, were hired as Admission Representatives in early February 2010, even, Plaintiff claims, though neither possessed an Associate's Degree.

As for the Student Services positions, Plaintiff participated in a group interview for the Student Services Coordinator position and another group interview for the Student Services Representative position. Collier was present at both interviews. It is a common practice at Daymar for Department Heads and/or the Campus President, Jody Wasmer ("Wasmer"), to participate in group interviews.

Wasmer and her superiors in Owensboro, Kentucky[5] were responsible for hiring the Student Services Coordinator, and, on March 1, 2010, they selected Leila Norrell ("Norrell"), a Caucasian female, for the position. This was a promotion for Norrell because she had been a Student Services Representative for the past year. Plaintiff does not dispute that Daymar has a policy to promote and fill positions with internal candidates when possible and appropriate.

Once Norrell became the Student Services Coordinator, she interviewed candidates to fill the position she had vacated. Plaintiff interviewed for the position, but it was given to Truesdale

---

[5] Wasmer reported to the Regional Director of Operations who, in turn, reported to the Vice President of Operations who, in turn, reported to the President of Daymar. Collier was not in this chain-of-command.

who transferred over from the Admissions Department.

Norrell had primary responsibility for hiring the new Student Services Representative, although her decision was subject to approval from higher-ups in the chain of command, including Wasmer. In support of her recommendation that Trusdale be selected, Norrell wrote:

> In her time as an Admissions Representative, I have witnessed first hand her high level of customer service and willingness to help our students. She has also approached me several times with ideas for fundraising, as well as connections for area resources which students can be referred to for further assistance. It is clearly evident in her demeanor and interactions with students, that Crystal has an Intelligent Heart. In her personal interview she stressed to me her strong desire to see students reach Graduation Day, despite life's hurdles that get in the way. I am confident that Crystal Trusdale will be a great asset to the Student Services Department.

(Docket No. 26-1 at 2). Wasmer approved the recommendation and Truesdale became the new Student Services Representative.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The

nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

Plaintiff claims she was subjected to race discrimination when she was not selected for a position, a hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 ("Section 1981"), and the Tennessee Human Rights Act ("THRA"), Tenn. Code. Ann. § 4-21-101 *et seq,* all of which "are analyzed identically." Aldridge v. City of Memphis, 404 Fed. Appx. 29, 37 (6th Cir. 2010) (collecting cases).

**A. Race Discrimination in Employment**

Like Title VII, the THRA prohibits discrimination based on race in relation to the "terms, conditions or privileges of employment," 42 U.S.C. § 2000e-2(a)(1); Tenn. Code Ann. § 4-21-401 (a)(1), and those statutes, as well as Section 1981, prohibit disparate treatment in employment. "Disparate treatment occurs when an employer treats some employees less favorably than others because of race[.]" Hughley v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive," id., and this may be shown either through direct evidence or indirect evidence utilizing the burden shifting paradigm of McDonnell Douglas v. Green, 411 U.S. 792 (1973), as refined by Texas Dep't of Cmty. Affairs v.

7

Burdine, 450 U.S. 248 (1981).

For the reasons explained in the Memorandum to be filed relating to the other Plaintiffs, the Court concludes that direct evidence of race discrimination does not exit in this case. Therefore, the Court turns to the indirect method of proving discrimination.

Under the burden shifting approach, Plaintiff must show that (1) that she is a member of a protected class; (2) that she applied for, and did not receive, a job; (3) that she was qualified for the job; and (4) that a similarly-situated person who was not in the plaintiff's protected class received the job. See, Anthony v. BTR Auto Sealing Sys. Inc., 339 F.3d 506, 514 (6th Cir. 2003); Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002); Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir. 1992). "After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." Dews v. A.B. Dick Co., 231 F.3d 1016, 1021 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. Id. Although the burden of production shifts under the McDonnell Douglas/Burdine paradigm, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir.2004) (internal citation omitted).

In this case, Daymar claims that Plaintiff has failed to establish a *prima facie* case of discrimination with respect to at least three of the four positions because she has not shown that she was qualified for the positions, and/or that similarly situated persons received the positions. In this vein, Daymar argues that Plaintiff was not qualified for the Admissions Representative positions because she was a student in the Federal Work Study Program who had numerous scheduling

8

conflicts, and was not similarly situated to the persons hired into the positions because those individuals were not federal work-study students. As for the Student Services Coordinator position, Daymar argues Plaintiff was not similarly situated because the person chosen for that position had a year's worth of experience in the Department, whereas Plaintiff did not.

Plaintiff's burden at the *prima facie* stage is "not intended to be an onerous burden. . . but instead a burden which is easily met." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). From all outward appearances, Plaintiff facially met the requirements for each of the positions sought, and Daymar has not presented evidence which shows otherwise. While Daymar presents reasons why Plaintiff was not ultimately selected for the positions, the focus at the *prima facie* stage is on "plaintiff's *objective* qualifications" with the concern being "whether he or she is qualified for the relevant job." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575 (6th Cir.2003) (emphasis in original). That is, "a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the *prima facie* case" because "[t]o do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." Id.

That said, Daymar has carried its burden of establishing a legitimate non-discriminatory reason for its employment decisions, and Plaintiff has not shown those decisions to be pretextual.

With regard to the Administrative Representative positions, Collier claims that she does not hire students because those are not positions students can fill in light of their workloads and the fact that the positions are full-time. Moreover, Daymar has a policy of not hiring Federal Work Study Students into the Admissions Department, and this is in keeping with federal regulations which

provide that "[a] proprietary institution may employ a student to work for the institution, but only in jobs that . . . [d]o not involve the solicitation of potential students to enroll at the proprietary institution." 34 C.F.R. § 675.21(b)(3).

As for the Student Services Coordinator position, Norell was hired because she already had experience as a Student Services Representative, something which Plaintiff lacked. See, Risch v. Royal Oak Police Dept., 581 F.3d 383, 391 (6th Cir. 2009) (hiring a better qualified applicant is a legitimate non-discriminatory reason). Finally, with respect to both Student Services positions, the hiring decisions were made by Wasmer, and others, which did not include Collier.

Because Daymar has set forth legitimate, non-discriminatory reasons for its employment decisions, the burden returns to Plaintiff to show that the given reasons are pretextual. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" Id. (citation omitted).

In the combined response to the four pending Motions for Summary Judgment, Plaintiff claims that she can show pretext because Daymar "substantially changed its reason for refusing to hire Ashley Collier into an Administrative Rep position." (Docket No. 59 at 23).[6] This is based on

---

[6] The Court notes that Plaintiff claims Collier was the one who made the selections to hire Norell and Trusdale into the Student Services positions. However, she has provided no competent evidence to support such assertions. She points to her deposition testimony in which she merely asserts Collier "had the final say," "made the hiring decisions," and, at one point allegedly told Plaintiff "that Student Services was

10

Plaintiff's contention that Collier told her "she did not receive the job because she did not have her Associate's Degree," but "now contends that her job interviews were not legitimate but were merely 'pretend' interviews and that she did not get the job because she was a 'current active student' and because she was in the federal work study program." (Id.). Plaintiff then goes on to assert that "Daymar made none of these allegations, however, until after it learned that its selected Caucasian hires do not hold Associates Degrees, either." (Id.).

"When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision." Cicero v. Borg–Warner Automotive, Inc., 280 F.3d 579 (6th Cir.2002). "'[T]he extent to which such shifting justifications are probative of pretext depends upon the circumstances of a given case' and the magnitude of the inconsistency." Aldridge v. City of Memphis, 404 Fed.Appx. 29, 38-39 (6th Cir. 2010) (citation omitted).

Plaintiff has not shown that Daymar has given shifting justifications for its failure to hire her into one of the Administrative Representative positions. Although Plaintiff contends Collier told her she was not hired because she had yet to complete her Associate's Degree, Collier disputes making any such statement, and Daymar's position throughout has been that, as a student and a federal work study employee, Plaintiff could not work in the Admissions Department.

---

her department." (Docket No. 65-5, Pf. Depo. at 29-30 & 52-53).

However, "[i]n order to survive summary judgment, Plaintiff cannot rely on conjecture," and "[c]onclusory assertions, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008). Further, even if Coller at some unidentified time said the Student Services Department was "her department," this does not rebut Newman's assertion that Wasmer and those in her chain of command made the hiring decisions in relation to the Student Services positions.

In fact, the deposition excerpts of both Collier and Newman (Daymar's Fed. R. Civ. P. 30(b) representative) upon which Plaintiff relies does not show any shifting rationale or "new" position by Defendants. To the contrary, in the cited portions of the depositions, Collier states that (1) Plaintiff was interviewed so that she could have the experience of a group interview; (2) Plaintiff was never considered to be a viable candidate "[b]ecause she was a current active student," "[y]ou don't hire a current active student in Admission's" and "[i]t's just not [the] best practice to hire a student in Admissions"; and (3) she told Plaintiff she could not hire her while Plaintiff was a work study student. (Docket No. 65-8, Collier Depo. at 57 & 130-134). Likewise, in the cited portions of the 30(b)(6) deposition, Newman testified that Plaintiff was ineligible for a position in the Admissions Department because she was a federal work study student and that Plaintiff was given an interview so that she would have some experience in the process. (Docket No. 65-6, Newman Depo. at 220).

In any event, when considering an employer's stated reasons for its decision, the Court "look[s] not only to whether changes in an employer's rationale have occurred, but to whether the circumstances could permit a rational factfinder to conclude that these changes are indicative that the currently-proffered explanation is false." Eades v. Brookdale Senior Living, Inc., 401 Fed. Appx. 8, 13 (6th Cir. 2010). Plaintiff has offered nothing which would indicate that Daymar's current proffered explanation is false.

Even if Collier did tell Plaintiff she was not hired because Plaintiff did not have an Associate's Degree, this is not inconsistent with the position that Plaintiff was not hired because she was a work study student, nor does it make the "present" explanation false. After all, when Plaintiff applied for the Admissions Department positions, she was still a Federal Work Study Student

12

working on obtaining her Associate's Degree, and she had a schedule which would conflict with full-time employment in the Admissions Department. Plaintiff has pointed to no evidence which suggests that Collier (or Daymar) hired students to work in the Admissions Department, let alone students in the Federal Work Study Program.

Summary judgment will be granted on Plaintiff's race discrimination.

### B. Retaliation Claim

As with a disparate treatment claim, a plaintiff "may establish retaliation either by introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Imwalle v. Reliance Medical Products, Inc., 515 F.3d 531, 542 (6th Cir. 2008). Because the Court determines in the forthcoming Memorandum that Plaintiffs have failed to set forth direct evidence of racial animus, the Court turns to whether Plaintiff has set forth circumstantial evidence "under the same McDonnell Douglas/Burdine evidentiary framework that is used to assess claims of discrimination." Id.

Plaintiff must first establish a *prima facie* case of retaliation by showing: (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action. Morris v. Oldham County Fiscal Court, 201 F.3d 784, 791 (6th Cir. 2000)(emphasis omitted). "If and when a plaintiff has established a *prima facie* case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." Id. at 792-93 (citation omitted). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered

13

reason was not the true reason for the employment decision.'" Id. at 793 (citation omitted).

In this case, Plaintiff's retaliation claim fails at the *prima facie* stage even though, just as in discrimination cases, "[t]he burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). There is no evidence that Plaintiff engaged in statutorily protected activity, that any such activity was made known to Daymar, or that there was a causal connection between any protected activity and an adverse employment action. Plaintiff does not show otherwise in the combined response in oppositions to the Motions for Summary Judgment, and summary judgment will be granted on this claim as well.

## C. Racial Harassment/Hostile Work Environment Claim

"To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act." Williams v. CSX Transp. Co., Inc., 643 F.3d 502, 511 (6th Cir. 2011). In this case, Plaintiff has not come close to showing that she was subjected to racial harassment sufficient to create a hostile work environment.

A hostile work environment arises "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. General Motors, 187 F.3d

553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Clark v. United Parcel Serv., Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting, Harris, 510 U.S. at 23).

In essence, work environment harassment involves repeated offensive conduct that changes the workplace into an "abusive working environment," Hunter v. Sec. of the Army, 565 F.3d 986, 994 (6th Cir. 2009). "However, the third element limits the scope of th[e] analysis: only harassment *based on the plaintiff's race* may be considered." Williams, 643 F.3d at 511.

Plaintiff (who never worked under Collier) identifies only four substantive contacts with Collier. Of those contacts, only the first – involving the statement about the wig – can arguably suggest some sort of racial connection. Plaintiff admits she kind of laughed it off, and did not think much of the comment.

Even if all of the contacts are considered, including the complimentary second contact, the third "limp noodle" contact, and the fourth "sticky note" contact, no reasonable jury could conclude that Plaintiff was subject to a work environment that was permeated with discriminatory intimidation, ridicule, and insult. Nor could a reasonable jury conclude that any alleged harassment was severe or pervasive enough to alter the conditions of Plaintiff's employment as she has presented no evidence that the contacts with Collier made it more difficult for her to do her job in

Financial Services.  Thus, summary judgment will be granted on this claim as well.

## IV.  CONCLUSION

On the basis of the foregoing, the Court will enter an Order granting Daymar's Motion for Summary Judgment (Docket No. 23) with respect to the claims of Plaintiff Ashley Collier.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE