UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERITHA SMITH, KENDRA GARCIA, LASHONDA DANDRIDGE, and ASHLEY COLLIER, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:10-00873 ) Judge Sharp |
| DRAUGHONS JUNIOR COLLEGE, INC. d/b/a DAYMAR INSTITUTE, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM

This is a racial discrimination, hostile work environment and retaliation case[1] against Defendant Draughons Junior College Inc. d/b/a Daymar Institute ("Daymar"). Plaintiffs are four African American females, Sheritha Smith ("Smith"), Kendra Garcia ("Garcia") Lashonda Dandridge ("Dandridge") and Ashley Collier ("Collier"), who were previously employed by Daymar, and they bring their claims under Title VII, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 ("Section 1981"), and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.* Daymar has filed separate Motions for Summary Judgment with respect to each Plaintiff (Docket Nos. 23, 28, 44 & 39), and those Motions have been fully briefed by the parties. (Docket Nos. 24, 37, 38, 49, 59 & 20).

This opinion addresses the claims of Plaintiffs Smith, Garcia and Dandridge (collectively "Plaintiffs"). In a separate opinion issued January 9, 2012 (Docket No. 90), the Court addressed

---

[1] Plaintiffs have opted not to pursue the outrageous conduct claim set forth in their Complaint. (Docket No. 59 at 1, n.1).

1

Plaintiff Collier's claims. That opinion sets forth the legal framework for each of the claims brought by all of the Plaintiffs and, to avoid unnecessary repetition, that framework is incorporated herein by reference.

## I. DISCUSSION

### A. General Background

Daymar is a private, post-secondary institution, with six campuses in Tennessee and Kentucky. Sometimes described as a "career college," Daymar offers associate's and bachelor's degrees in a variety of different programs.

This case centers around the Admissions Department at Daymar's Nashville, Tennessee campus. The Department was headed by Elizabeth Collier ("Collier") who served as the Director of Admissions from October 2007 until August 2011.[2] All of the Plaintiffs worked in the Admissions Department as Admissions Representatives ("Reps"): Smith from April 2008 through April 2010; Garcia from February 2008 through September 2009; and Dandridge from October 2008 through March 2009.

The basic role of employees in Daymar's Admissions Department is to make sales, with Admission Reps expected to bring in new students. Reps work on leads from prospective students. Leads may take the form of internet inquiries, phone call inquiries (a "call-in"), or personal inquiries on campus (a "walk-in"), with the latter two types of inquiries considered to be preferred leads because they more often result in enrollment.

The ultimate goal of a Rep is to have a student actually attend Daymar. Towards that end,

---

[2] From June 1, 2009 until September 8, 2009, Collier was on maternity leave, and, during that time, the Admissions Department employees were supervised by Christi Hays ("Hays"), the Regional Director of Daymar, and Jody Wasmer ("Wasmer"), the Nashville Campus President.

Reps call and follow-up on leads, set appointments, conduct interviews, enroll students, and attempt to ensure that the students actually start classes. Getting from one step to the next is called a conversion, and each step of the process is tracked in a program called CampusVue. Admission Reps are required to log their activities daily into CampusVue.

CampusVue generates conversion percentages for each Rep, and the conversion percentage is the main objective criteria on which a Rep's performance is judged. Collier's performance is evaluated based on her team's conversions and student start numbers.

Most important in terms of conversion percentages are the percentage of leads to enrollment and the percentage of enrollees who start classes.[3] The industry and company standard for the conversion of leads to enrollments is 20%, although Daymar's goal for leads to enrollments is 15%. As for the percentage of enrollees who start classes, Daymar has an "aim high" goal of 80%, but the minimum expectation is 65%.[4]

When a Rep fails to meet his or her expected quota during a given period, that employee may be placed under a Performance Improvement Plan ("PIP"), which is used to help Reps improve performance. An employee may also be placed under a PIP when he or she exhibits a bad attitude or poor work ethic. A Rep placed in a PIP may be provided extra training, monitoring, and feedback on ways to improve. If a Rep under a PIP fails to show satisfactory improvement, that Rep's employment with Daymar may be terminated.

---

[3] Even though the ultimate goal is to have students actually enroll and attend classes, Daymar also has minimum standards for the conversion percentages with regard to interviews and appointments because more earlier conversions ultimately result in more enrollments and attendance.

[4] In a declaration, Collier claims that although some company forms indicated that the minimum conversion rate was 65%, "it was well-understood in Admissions that the expectation was 70%." (Docket No. 36, Collier Decl. ¶ 28).

At the Nashville campus, leads are distributed to Reps on multiple occasions during the day. The receptionist in the Admissions Department is supposed to distribute each day's internet leads among the representatives working that day, and distribute the walk-in and call-in leads to the Rep who is first available at the time the lead walks in or calls in. Whether that actually occurred in practice is disputed because Plaintiffs claim that Collier favored Caucasians by giving them the preferred leads (walk-ins and call-ins), and directed the receptionist to do the same. Further, while Plaintiffs do not dispute that Collier had the authority to override the general rules of distribution based upon who was performing and who was not, and while they do not dispute it is in Daymar's interest to have higher performing Reps work leads, Plaintiffs assert Collier utilized her authority, not to reward those who were performing well (i.e. by converting leads to interviews, appointments and enrollments), but to favor Caucasian employees.[5]

Plaintiffs also claim that Collier engaged in repeated offensive and discriminatory conduct towards African-Americans. Just by way of examples, Plaintiffs allege that Collier referred to African-American employees in the Admissions Department as "you people," and made statements to African American employees such as "you people and your weaves," "you people and your chicken," and "you people are just lazy." She also allegedly referred to African Americans as being "ghetto," and claimed they were using "ghetto talk" and "ghetto cackling." Caucasians who acted in certain ways were allegedly referred to by Collier as "wiggers." Collier also allegedly made

---

[5] In her deposition, Smith testified that, from her office, she could hear the walk-ins come in, and saw Collier assign those walk-ins to Caucasians "most" of the time. (Docket No. 65-1, Smith Dep. at 107-108). For her part, Dandridge testified that, from her observation, African-American employees did not get many leads. (Docket No. 65-4, Dandridge Dep. at 93). Garcia, whose desk was behind the receptionist, also claims leads were distributed in a discriminatory manner, that she once raised the issue in an e-mail to Collier, and that Smith raised the same issue during a group meeting with Collier. (Docket No. 65-2, Garcia Dep. at 92-102).

comments about ethnicity, hair and skin color. Further, and on more than one occasion, Collier allegedly stated, "it's too dark in here, we need to lighten things up," or words to that effect.

Plaintiffs also claim that Collier treated African-American employees very differently than Caucasian employees, even apart from the unfair distribution of leads. For example, at department meetings, Collier allegedly praised and complimented the Caucasian Reps, but used profane and abusive language toward the African American Reps, and made comments about them being lazy. She would also threaten the African American employees that they would lose their jobs.

Plaintiffs are not alone in their suggestion that Collier was unprofessional in her conduct, and that she singled out African Americans for abuse. In opposition to the Motions for Summary Judgment, Plaintiffs submitted the declaration of Daphne Graskewicz ("Graskewicz"), a Caucasian who served as the Assistant Registrar at the Daymar Campus from February 23, 2009, until July 24, 2009.

Graskewicz claims that Collier made many comments about Daymar being "too ghetto" and "too dark," that she "wanted to 'lighten the place up,'" and that the school needed "more quality students" which Graskewicz understood to mean more Caucasian students. (Docket No. 68, Graskewicz Decl. ¶ 3). Graskewicz also claims that she "constantly heard" Collier "make offensive, personal, derogatory comments and insults toward and about African-Americans, and used "the terms 'ghetto' and 'wigger' constantly." (Id. ¶ 4). Collier also allegedly "stated that she was going to 'get her ghetto card'" and "would make exaggerated gestures with her head and arms and do her impression of an African-American person." (Id.). Graskewicz further claims Collier "would place African-American employees in the office next to her so that she could 'keep an eye on them' so that, as she stated, 'when they screwed up' they would be 'out the door.'" (Id.). Additionally,

5

Collier allegedly replaced an African American receptionist in the Admission Department, stating "she did not want the first impression of Daymar to be 'someone ghetto answering the phones.'" (Id. ¶ 5). Graskewicz states that she "ultimately decided to resign from [her] position because of the racially hostile work environment at Daymar." (Id. ¶ 7).[6]

It is against this backdrop that Plaintiffs bring their discrimination, retaliation, and hostile work environment claims. Prior to discussing those claims, however, the Court will address Plaintiffs' contention that they have direct evidence of discrimination and retaliation which would obviate the need for them to utilize the McDonnell Douglas / Burdine framework for proving a circumstantial case.

**B. Direct Evidence**

The Sixth Circuit has explained "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp., 176 F.2d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was

---

[6] Daymar claims that Graskewicz's "testimony is neither relevant nor credible." (Docket No. 70 at 7). It is not credible, Daymar insists, because Graskewicz left voluntarily and, in doing so, tendered a resignation letter in which she stated that she "enjoyed her employment" and "the friendships I have made." (Id.). The allegedly contradictory reasons for Graskewicz's resignation does not make her testimony inherently incredible, and it will be for the jury to assess her credibility.

As for relevancy, Daymar cites Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 337 (6th Cir. 2008) for the proposition that "[a]nything Graskewicz allegedly heard or observed can be relevant only to the extent Graskewicz communicated something to Plaintiffs during their employment[.]" (Id.) Many of the comments attributed by Graskewicz to Collier are the same sort of comments attributed to Collier by Plaintiffs. Additionally, at least one Plaintiff, Garcia, claims that Graskewicz witnessed Collier saying that the place had to be lightened up because it was getting too dark. (Docket No. 65-2, Garcia Depo. at 190). Thus, the Court will not simply ignore Graskewicz's declaration in ruling on the Motions for Summary Judgment, although the Court will consider placing limits on her testimony at trial if shown to be warranted.

motivated at least in part by prejudice against members of the protected group." Johnson v. Kroger, 319 F.3d 858, 865 (6th Cir. 2003). Moreover, "[i]t is well established that isolated and ambiguous comments are not sufficient to make out a direct-evidence case of employment discrimination." Weigel v. Baptist Hosp. of East Tennessee, 302 F.3d 367, 382 (6th Cir. 2002), but "a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." Nguyen v. Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Plaintiffs claim Collier's alleged statement(s) that "we need to lighten things up, it's too dark in here," or words to that effect, constitute direct evidence.[7] In doing so, they rely on DiCarlo v. Potter, 358 F.3d 408 (6th Cir. 2004) and Fite v. Comtide Nashville, LLC, 686 F. Supp.2d 735 (M.D. Tenn. 2010).

In DiCarlo, plaintiff DiCarlo, a terminated postal worker, filed suit alleging national origin discrimination after his supervisor, Bailey, "called him a 'dirty wop' and complained of there being too many 'dirty wops' working at the postal facility." DiCarlo, 358 F.3d at 415-16. The Sixth Circuit found this could be direct evidence because there was "a genuine issue of material fact whether Bailey's decision to terminate DiCarlo was based on his predisposition to discriminate on the basis of national origin." Id. at 417. "In particular, the fact that the comments were made by Bailey, DiCarlo's immediate supervisor and a decision-maker, that they specifically negatively and derogatorily referenced DiCarlo's Italian-American heritage, and that the hate-speech occurred three weeks prior to DiCarlo's termination, all culminate in the conclusion that DiCarlo has presented sufficient evidence of causation to withstand summary judgment." Id. The court observed that "the

---

[7] In their combined response brief, Plaintiffs' alternatively characterize Collier's statement(s) as "lighten," or "whiten." Although Garcia testified in her deposition about Collier using the term "whiten," she did so in relation to what Graskewicz allegedly heard, and Graskewicz specifically states in her declaration that Collier made comments about "lightening" the place up.

7

temporal proximity between the discriminatory act and the termination creates a far different scenario" than in Hein v. All America Plywood Co., 232 F.3d 482, 489 (6th Cir. 2000) where the direct evidence stemmed from conduct which occurred more than five months prior to the plaintiff's termination.

Fite involved alleged comments virtually identical to those in this case. Specifically, Judge Trauger of this Court was presented with evidence suggesting that, shortly after arrival, the new general manager of a car dealership stated that he planned to "lighten the place up" which one of the plaintiffs interpreted to "mean that [the general manager] was going to fire dark-skinned people and hire light-skinned people," an interpretation which "was confirmed when a 'few hours later you've got Caucasian applicants coming in interviewing for jobs and [the general manager] said this is what I'm talking about.'" Fite, 686 F.Supp.2d at741. In concluding direct evidence existed to support a discrimination claim, Judge Trauger opined "[t]his case is similar to DiCarlo" because "within weeks" of the general manager's arrival, plaintiffs were terminated. Id. at 751.

This case is like Fite in that a supervisor with decision-making authority is alleged to have made a comment or comments about "lightening up" the place. However, it is unlike either Fite or DiCarlo because Plaintiffs do not establish a close proximity in time between Collier's alleged "lighten up" comment(s) and an adverse employment action (at least in relation to Smith and Garcia), nor do they show that Collier was predisposed to act in a racially biased manner based simply on her "lighten up" comments.

Plaintiffs do not identify when the alleged comment(s) were made. In opposition to the Motions for Summary Judgement, Plaintiffs cite to the deposition testimony of Garcia and Dandridge, as well as Graskewicz's declaration. Dandridge was terminated in March 2009. Garcia

was terminated on September 2009, but she relies on Graskewicz for the proposition that Collier made the "lighten up" comments, and Graskewicz voluntary left employment at Daymar in July 2009.

Given the evidentiary record, the Court can only speculate as to when the potentially offensive comment(s) were allegedly made, something which the Court should not have to do when the Plaintiffs seek to base their claim on direct evidence because, as both DiCarlo and Fite instruct, when the statement was made is critical. However, because Collier was on maternity leave from June 1, 2009 to September 8, 2009, any statement Collier is alleged to have made about "lightening up the place" had to have been made at some point prior to June 1, 2009. This would have been at least three and one-half months before Garcia was terminated, and at least ten months before Smith was terminated, neither of which suggest a nearness in time akin to that in either DiCarlo or Fite.

Regardless of temporal proximity or lack thereof, to establish a direct evidence case, Plaintiffs must show "not only that the employer was predisposed to discriminate on the basis of race, but also that the employer acted on that predisposition." DiCarlo, 358 F.3d at 415. For one alleged to have acted on a predisposition to discriminate on the basis of race based on her "lighten up" comment(s), Collier certainly acted outside of character in many respects.

For example, Daymar has presented evidence which suggests Collier was "influential" in hiring Dandridge, and at least played some role in the hiring of Smith.[8] Further, at about the same time that Dandridge was terminated, Daymar claims that Collier hired Chacorey Davis, an African American, as an Admissions Rep. Additionally, Collier and Wasmer gave Smith an annual

---

[8] Although Smith claims that she was actually hired by Barbara Holliman, she grudgingly conceded in her deposition that Collier at least "agreed to hire" her. (Docket No. 65-1, Smith Depo. at 98-99).

9

performance review in May 2009 that Smith characterizes as "excellent," a review which would have happened near the time that Collier is alleged to have made her comments. Finally, after Collier returned from maternity leave, she encouraged Smith to seek counseling when Smith confided to her about personal problems, and Smith was allowed to take that leave.

In sum, Plaintiffs' purported direct evidence case rests upon their assertion that, at some unidentified point, in time Collier talked about lightening the place up because it was too dark. Even assuming such comments constitute direct evidence of racial bias on the part of Collier,[9] Plaintiffs have not come close to linking any such statements with their terminations and, as such, have not shown causation based on those statements alone. The jury would be required to draw inferences (while at the same time ignore undisputed evidence) in order to conclude that Plaintiffs' terminations were motivated, at least in part, because Collier allegedly expressed prejudice by making comments that she needed to "lighten up the place." Of course, Collier's alleged statements may be used by Plaintiffs to prove discrimination and retaliation through circumstantial evidence.

## C. Race Discrimination Claims

As noted in the Memorandum issued in relation to Plaintiff Collier's claims, the burden of establishing a *prima facie* case of discrimination or retaliation is not onerous, but rather is one easily met.[10] With regard to Plaintiffs' race discrimination claims, Daymar does not assert that they cannot

---

[9] Arguably the comments do not show racial bias because the comments could be a reference to the need to open window blinds to lighten the place up because it was too dark, or a reference to a lack of humor or levity in the workplace. Such statements are certainly not as clear as in the classic direct evidence case where a university president is alleged to have said, "We already have two black vice presidents. I can't bring in a black provost." Johnson v. Univ. of Cincinnati, 215 F.3d 561, 577 n.7 (6th Cir. 2000).

[10] The elements of a failure to hire case and a termination case are substantially similar except, in a termination case, a plaintiff must show, as the second element, that she was qualified to do her job. See, White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008) (setting forth elements).

10

establish a *prima facie* case.[11] Rather, Daymar claims that it has legitimate non-discriminatory reasons for Plaintiffs' terminations, which Plaintiffs cannot show to be pretextual.

Turning to the second part of the McDonnell Douglas / Burdine burden shifting framework, Daymar has set forth legitimate non-discriminatory reasons for its decisions relating to Plaintiffs' terminations. Dandridge was terminated allegedly because she was "selling" financial aid to a prospective student on March 12, 2009, in violation of Daymar policy and Tennessee regulations. Garcia was terminated ostensibly because her performance declined while she was under a PIP, and her performance at the time of her termination was worse than that of her peers. Smith allegedly was terminated for the same reasons as Garcia – failure to improve under a PIP and poor performance – and also because she allegedly engaged in conduct which distracted other employees and students, such as singing and whistling loudly while walking up and down the hallways, and engaging in lengthy conversations with employees who were trying to work.

Because Daymar has presented legitimate non-discriminatory reasons for its employment actions, the burden returns to Plaintiffs to show that those reasons are but a pretext to mask discrimination. As pointed out in the ruling relating to Plaintiff Collier, "[a] plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." White, 533 F.3d at 391. "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment

---

[11] All Daymar argues in relation to the *prima facie* case is that, to the extent Plaintiffs complain about being placed on a PIP, this does not amount to an adverse employment action. However, Plaintiffs assert the adverse employment actions were their terminations.

action was its actual motivation.'" Id.

Here, Plaintiffs have presented evidence from which a reasonable jury could conclude that the stated reasons for their terminations had no basis in fact, were not the actual reason, and/or were insufficient to warrant termination. With regard to Dandridge, she claims she did not attempt to sell financial aid on the day in question, claims she repeatedly advised the caller that she was not a financial aid representative, told the caller he needed the Financial Aid Department to answer his financial aid inquiries, and gave him the phone number of the Director of Financial Aid. Dandridge also asserts that when confronted about the incident that same day, she asked for a copy of the tape recording of the call but was refused, even though Daymar tape records each telephone conversation. This evidence alone raises questions whether the purported reasons for dismissal had a basis in fact and was the real reason for Dandridge's termination. Another issue of fact is whether the selling of financial aid on one occasion warrants dismissal in light of Daymar's progressive discipline system.

As for both Garcia and Smith, they were terminated because they allegedly did not improve under a PIP. Daymar insists that their poor performance is confirmed by CampusVue software. However, one of Plaintiffs' primary complaints in this case is that Collier distributed leads in a discriminatory manner by giving the preferred leads – call in and walk in leads – to Caucasians, and this impacted on their overall performance because those leads (as opposed to internet inquiries) far more often resulted in enrollment and attendance at Daymar. The CampusVue software does not appear to differentiate between the types of leads, but instead shows overall conversion ratios for the categories "inquiries to appointments," "appointments to interviews," "interviews to applications," "inquires to enrolls," "calls per day" and "certified start rates." (See, e.g., Docket No.

36-6).

Moreover, Plaintiffs have pointed to evidence which shows that Caucasians who did not meet their quotas were not terminated. In fact, Collier admitted in her deposition that (1) while Crystal Truesdale "was not an exceptional Admission Rep numberwise," she was allowed to transfer to the Student Services Department; (2) Blake Bancroft was under a PIP but continues in employment under her supervision; and (3) Katie Webster did not make her quotas, was put on a PIP, continued to work, and then later voluntarily left Daymar. (Docket No. 65-8, Collier Depo. at 119-121). Certainly there may be non-discriminatory reasons for what may be considered to be different treatment as between African American and Caucasian Admissions Reps at Daymar, but that will be something for the jury to determine.

Further with respect to both Garcia and Smith, Plaintiffs have presented evidence which a jury may consider to be shifting justifications for their terminations. See, Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question"). Daymar notified the Tennessee Department of Labor "("TDOL") that Garcia was discharged because she found a "better opportunity," and that she was eligible for rehire at Daymar, something which obviously was not the case. While Daymar insists "[c]learly this is simply a mistake by the Payroll Specialist reviewing the personnel files," (Docket No. 70), that is an argument best made to the jury. Similarly, while Daymar claims that it was not required to put everything on the TDOL's Separation Form when it claimed Smith was terminated for poor performance, a jury is entitled to determine whether Damar's present claim that Smith was also insubordinate and engaged in disruptive behavior is a shifting justification meant to cover up alleged discrimination.

Because numerous questions about the real reasons for Plaintiffs' terminations abound, summary judgment will be denied on Plaintiffs' race discrimination claims.

**D. Retaliation Claims**

As noted in the Memorandum resolving Plaintiff Collier's claims, among the elements of a retaliation claim is that a plaintiff engaged in a statutorily protected activity which was made known to the defendant, and that there is a causal connection between the protected activity and an adverse employment action or severe and retaliatory harassment. See, Linday v. Yates, 578 F.3d 407, 418 n.10 (6th Cir. 2009) (setting forth elements). Contrary to Daymar's arguments, each of the Plaintiffs have met the non-onerous burden of establishing a *prima facie* case.

With regard to Smith, Daymar concedes that she made an internal complaint against Collier on April 7, 2008, and that she filed a charge of discrimination with the Equal Employment Opportunity Commission a week later. Daymar contends, however, that Smith cannot show knowledge or causation because, at the time she complained, Daymar had already decided to place her on a PIP. Even accepting that Daymar had already made the decision before Smith complained, summary judgment is inappropriate because the adverse employment action, to wit Smith's termination, occurred 21 days after she complained to Wasmer about Collier's conduct. This temporal proximity is sufficient to raise a question of fact as to whether Smith's complaints were the real cause of her termination. See, Sinfield v. Akron Metro. Housing Auth., 389 F.3d 555, 563 (6th Cir. 2004) (citation omitted) ("'Causation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge'").

As for Garcia, Daymar argues that "the only evidence of 'opposition' that Garcia has

14

submitted is that she complained to Collier of unfairness a couple of times during her employment," and that (because of Collier's maternity leave) "the only 'complaint' by Garcia that bears any temporal relation to her termination is an email on September 14, 2009 asking why Collier distributed leads the way she did." (Docket No. 38 at 19). Daymar then argues that "[a]ny reasonable jury would find this complaint to be a typical, garden-variety work complaint, insufficient to show a retaliatory motive by Collier." (Id.).

It could be that a reasonable jury would find Garcia's September 14, 2009 e-mail a "garden variety" complaint because, in the email, Garcia simply questions why Collier told the receptionist to "give the majority of leads to Debbie, Jennifer and Blake," three Caucasian reps. (Docket No. 65-3). On the other hand, a reasonable jury, knowing that Garcia had complained on at least a couple of occasions in the past,[12] could conclude that the September 14, 2009 e-mail was the last straw as far as Collier was concerned, and that Collier terminated Garcia a week later in retaliation for the complaint.

Finally, in regard to Dandridge, Daymar argues "the only evidence of 'opposition' that Dandridge has submitted is her complaint to Collier herself a week or two before she was terminated," and that, "[a]ssuming she made this complaint, Dandridge cannot show that Hays, Melton or Wasmer knew of it." (Docket No. 54 at 20).[13] However, in the very same brief, Daymar asserts that once Hays allegedly overheard Dandridge selling financial aid, "Hays then brought Collier in, together they brought Wasmer in, Wasmer brought Amy Melton in, and together they

---

[12] In her deposition Garcia testified that, while she had complained in the past, she became "afraid" to complain any more because she feared losing her job in light of what happened to Dandridge after Dandridge complained. (Docket No. 65-2, Garcia Dep. at 182-185).

[13] Amy Melton ("Melton") was the Regional Director of School Operations.

15

made the decision to terminate Dandridge's employment." (Id. at 18-19). Moreover, in its statement of undisputed material facts, Daymar states that "Hays, Melton, Wasmer, Collier and Fred Smith, the VP of HR, decided to terminate Dandridge's employment." (Docket No. 62 at 22 ¶ 93). These statements alone are sufficient to call into question whether Collier, who indisputably knew about protected activity by Dandridge, was a key factor in Dandridge's termination or exerted influence on others to terminate Dandrige's employment.

As for legitimate non-retaliatory reasons for each Plaintiffs' termination and whether the stated reasons are pretextual, the parties rely on the arguments made in relation to Plaintiffs' discrimination claims. For the reasons already stated, the Court finds that, even though Daymar has articulated legitimate, non-discriminatory reasons for Plaintiffs' terminations, Plaintiffs have presented sufficient evidence to raise a jury question on whether, in fact, those stated reasons were the true reasons for Daymar's employment actions. Therefore, summary judgment will be denied on Plaintiffs' retaliation claims.

**E. Hostile Work Environment**

Unlike Plaintiff Collier, present Plaintiffs, each of whom worked directly under Collier, have presented sufficient evidence to survive summary judgment on their hostile work environment claim. This conclusion is based upon a reading of each of the Plaintiffs' depositions which are a part of the record, readings which lead the Court to conclude that a reasonable jury could determine that, from both an objective and subjective standpoint, Plaintiffs worked in an environment permeated with racial comments by, and racial insensitivity on the part of, Collier.

In reaching this conclusion, the Court has considered the arguments raised by Daymar in their papers and the numerous cases cited where courts have found the evidence to be insufficient

to raise a triable issue on a hostile work environment claim. However, "each case turns on the specific facts presented and this Court is to look at the totality of the circumstances in determining if sufficient evidence exists to warrant a trial on whether the alleged conduct constitutes harassment." Lyle v. The Cato Corp., 730 F.Supp.2d 768, 779 (M.D. Tenn. 2010). In doing so,

> The Court is not to disaggregate the incidents by divid[ing] and categoriz[ing]' them because to do so 'divorc[es] them from their context and depriv[es] them of their full force.' Williams [v. General Motors Corp., 187 F.3d 553, 562 (6th Cir. 1999)]. This is because 'when the complaints are broken into their theoretical component parts, each claim is more easily dismissed.' Id. Instead, 'the totality-of-circumstances test must be construed to mean that even where individual instances of [racial] harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation.' Id. at 563.

Lyle, 768 F.Supp.2d 779. Additionally, while some of Collier's comments could be characterized as race-neutral or inoffensive (*e.g.* "you people" or "I don't have to be fair"), context matters because "[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546 U.S. 454, 455 (2006). The Court will allow the jury to decide whether any or all of the Plaintiffs were, in fact subjected to a racially hostile work environment.

## II. CONCLUSION

On the basis of the foregoing, Daymar's Motions for Summary Judgment with respect to the claims brought by Plaintiffs Smith, Dandridge, and Garcia will be denied, except with respect to Plaintiffs' outrageous conduct claim under Tennessee common law.

An appropriate Order will be entered.

_Kevin H. Sharp_
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE